*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

THOMAS J. O'BRIEN, JR.,

      Plaintiff-Appellee,

v

ANN MARIE D'ANNUNZIO,

      Defendant-Appellant.

UNPUBLISHED
February 27, 2020

No. 347830
Oakland Circuit Court
Family Division
LC No. 2004-693882-DC

Before: MURRAY, C.J., and SAWYER and GLEICHER, JJ.

PER CURIAM.

Defendant appeals as of right an order granting plaintiff sole legal and physical custody of the parties' twin children, GDO and IDO. The same order provided no parenting time for defendant, subject to periodic review to determine whether reinstituting parenting time would be in the children's best interests. Although we agree with several claims of error raised by defendant on appeal, we affirm the trial court's order because each error was harmless.

## I. BACKGROUND

The parties are parents of twin children, but were never involved in a romantic relationship with each other. Throughout most of the children's adolescence, the parties got along and effectively coparented their children with little court involvement. However, defendant's relationships with plaintiff and then 13-year-old IDO became strained in the summer and fall of 2017, prompting the parties to initiate the instant custody dispute. At the time, the parties shared legal custody and defendant had physical custody of the children, with plaintiff exercising parenting time on one weekday overnight, every other weekend, and alternating holidays.

Plaintiff filed a verified emergency motion for a change of custody, alleging that defendant had "a history of losing her temper beyond the point of control," and that defendant's recent erratic and dangerous behavior constituted a change of circumstances or proper cause to modify custody because the children were in "a state of complete emotional upheaval[,] fleeing [defendant's] residence regularly." Plaintiff identified examples of defendant's concerning behavior and detailed three instances in which the police were called to intervene in confrontations between defendant and the children. In response to plaintiff's motion, defendant alleged that IDO had

become increasingly disrespectful toward her since June 2017, particularly with respect to matters involving social media, and that plaintiff was using the parties' contrasting parenting styles to undermine defendant's relationships with the children. Plaintiff's motion was referred to the Friend of the Court (FOC) for a recommendation, and the trial court signed an interim parenting-time order with an approximately equal parenting-time schedule.

Shortly thereafter, plaintiff filed an ex parte motion to suspend defendant's parenting time. Plaintiff claimed that defendant had continued to engage in alarming behavior, such as chasing IDO down the street in a car, having an outburst during a meeting with the FOC custody and parenting-time specialist, and attempting to remove the children from school midday. Plaintiff alleged that the police had been called two more times and that a Children's Protective Services (CPS) investigation was underway. Plaintiff sought a temporary order suspending defendant's parenting time because the children were "petrified" of defendant and refused to spend time with her. The trial court signed an ex parte order granting plaintiff "temporary full-time parenting time" until the matter could be addressed at the court's next motion call. The order also barred defendant from appearing at the children's school or initiating contact with the children in any manner.

At the hearing on November 15, 2017, plaintiff's counsel asked the trial court to adopt a recent recommendation from Kathleen Doan, the court's FOC custody and parenting-time specialist, in which Doan recommended that defendant complete a psychological evaluation and parenting classes and that the trial court suspend defendant's parenting time in the interim. Consistent with Doan's recommendation, the trial court continued the order suspending defendant's parenting time in light of the high-conflict state of the case. The children remained free to contact defendant at their discretion and plaintiff was ordered not to discourage the children from doing so. Defendant had little direct contact with the children throughout the remainder of the case.

The court scheduled an evidentiary hearing concerning plaintiff's motion to modify custody in January 2018, but the matter was adjourned when the parties agreed to try to resolve the matter with therapeutic counseling outside of court. The parties quickly disagreed about the requirements of their stipulated order, so the evidentiary hearing began on March 20, 2018, and consisted of nine days of proceedings over the course of eight months. In July 2018, the parties again tried to resolve their dispute by agreeing to a specific schedule of parenting-time visits and joint counseling sessions with defendant and the children. However, each time defendant had in-person contact with the children, the children were left in a distraught and emotional state. The children repeatedly expressed fear and anger toward defendant in counseling and little progress was made to repair the relationships between defendant and the children.

Several months after the evidentiary hearings concluded, the trial court issued a lengthy opinion regarding the parties' custody and parenting time. The trial court determined that revisiting the parties' custody arrangement was warranted because the extreme coparenting difficulties the parties faced took a high toll on the children and was contrary to their best interests. Although the trial court's discussion of the children's established custodial environment was somewhat ambiguous, it analyzed the matter as though the children had an established custodial environment with both parties. Applying a clear and convincing evidence standard, the trial court considered each of the statutory best-interest factors, MCL 722.23, citing evidence relevant to each factor and concluding that granting plaintiff sole legal and physical custody was in the children's

best interests in light of defendant's "bizarre and concerning behaviors" and the emotional and chaotic environment in which the children lived while in defendant's care. With respect to parenting time, the court held that it was not in the best interests of the children to have parenting time with defendant because there was clear and convincing evidence that parenting time would further endanger the children's physical, mental, or emotional health. The court reasoned that forcing the children to interact with defendant would only damage, rather than foster, the parent-child relationships. However, "cognizant of the significance of its ruling, and so as not to constitute a *de facto* termination of [defendant's] parental rights with no review mechanism," the court permitted periodic review hearings to determine whether reinstituting parenting time would be in the children's best interests. This appeal followed.

## II. STANDARDS OF REVIEW

In matters involving child custody, " 'all orders and judgments of the circuit court shall be affirmed on appeal unless the trial judge made findings of fact against the great weight of evidence or committed a palpable abuse of discretion or clear legal error on a major issue.' " *Yachcik v Yachcik*, 319 Mich App 24, 31; 900 NW2d 113 (2017), quoting MCL 722.28. "Under the great weight of the evidence standard, this Court should not substitute its judgment on questions of fact unless the facts clearly preponderate in the opposite direction." *Shade v Wright*, 291 Mich App 17, 21; 805 NW2d 1 (2010). The trial court's ultimate decision to change custody is reviewed for an abuse of discretion, which exists in the context of child custody disputes " 'when the result is so palpably and grossly violative of fact and logic that it evidences a perversity of will, a defiance of judgment, or the exercise of passion or bias.' " *Yachcik*, 319 Mich App at 31, quoting *Sulaica v Rometty*, 308 Mich App 568, 577; 866 NW2d 838 (2014). Questions of law are reviewed for clear legal error, which occurs when the trial court "incorrectly chooses, interprets, or applies the law." *Sulaica*, 308 Mich App at 577. In addition, this Court reviews a trial court's discovery rulings for an abuse of discretion. *Augustine v Allstate Ins Co*, 292 Mich App 408, 419; 807 NW2d 77 (2011).

## III. PROCEDURE FOR MODIFYING CHILD CUSTODY

Defendant first argues that the trial court erred by effectively granting plaintiff custody on November 15, 2017, without complying with the procedural requirements of the Child Custody Act, MCL 722.21 *et seq*. In a related argument, defendant also takes issue with the trial court's reliance on an FOC recommendation in ruling on defendant's January 2018 motion to restore her custodial rights. We agree, in part, but conclude that the trial court's procedural error was harmless.

"As set forth in MCL 722.27(1)(c), when seeking to modify a custody or a parenting-time order, the moving party must first establish proper cause or a change of circumstances before the court may proceed to an analysis of whether the requested modification is in the child's best interests." *Lieberman v Orr*, 319 Mich App 68, 81; 900 NW2d 130 (2017). This Court announced the threshold requirements a party seeking a change of custody must satisfy in *Vodvarka v Grasmeyer*, 259 Mich App 499, 512-514; 675 NW2d 847 (2003):

> [T]o establish "proper cause" necessary to revisit a custody order, a movant must prove by a preponderance of the evidence the existence of an appropriate ground

-3-

for legal action to be taken by the trial court. The appropriate ground(s) should be relevant to at least one of the twelve statutory best interest factors, and must be of such magnitude to have a significant effect on the child's well-being. When a movant has demonstrated such proper cause, the trial court can then engage in a reevaluation of the statutory best interest factors.

\* \* \*

[I]n order to establish a "change of circumstances," a movant must prove that, since the entry of the last custody order, the conditions surrounding custody of the child, which have or could have a *significant* effect on the child's well-being, have materially changed. Again, not just any change will suffice, for over time there will always be some changes in a child's environment, behavior, and well-being. Instead, the evidence must demonstrate something more than the normal life changes (both good and bad) that occur during the life of a child, and there must be at least some evidence that the material changes have had or will almost certainly have an effect on the child. This too will be a determination made on the basis of the facts of each case, with the relevance of the facts presented being gauged by the statutory best interest factors.

If the trial court determines that proper cause or a change of circumstances has been established, it must then consider whether the proposed change is in the best interests of the child. *Lieberman*, 319 Mich App at 83. "In matters affecting custody, when the child has an established custodial environment with each parent, the movant must prove by clear and convincing evidence that the proposed change is in the best interests of the child." *Id*. at 83-84. Custody decisions, as well as parenting-time decisions that would alter the child's established custodial environment, require findings under all of the statutory best-interest factors. *Id*. at 84. "An evidentiary hearing is mandated before custody can be modified, even on a temporary basis." *Grew v Knox*, 265 Mich App 333, 336; 694 NW2d 772 (2005).

Defendant asserts that the trial court erred by failing to comply with these procedural requirements before granting plaintiff full-time parenting time in November 2017. We agree. On November 6, 2017, while plaintiff's motion to change custody was pending, the trial court signed an ex parte order suspending defendant's parenting time. The court heard oral arguments concerning plaintiff's emergency motion to suspend defendant's parenting time on November 15, 2017. At the conclusion of the brief hearing, the trial court signed an order continuing the suspension of defendant's parenting time and ordering that plaintiff "have the children full-time." Although the trial court framed its order in terms of parenting time only, the complete suspension of defendant's parenting time had the effect of modifying physical custody of the children because it gave plaintiff complete physical care and supervision of the children while the order remained in effect, where physical custody had previously been vested in defendant. See *Lieberman*, 319 Mich App at 79-80 (describing physical custody). Because the trial court's order modified the children's custody, the court was required to first hold an evidentiary hearing and make the findings detailed above, which it did not do. This was a clear error of law. Nonetheless, the trial court's error was harmless under these circumstances. *Fletcher v Fletcher*, 447 Mich 871, 889; 526 NW2d 889 (1994) ("[U]pon a finding of error, appellate courts should remand to the trial court unless the error was harmless.").

In its later opinion following the evidentiary hearings, the trial court found proper cause or a change of circumstances based upon the breakdown of the parties' ability to coparent that occurred before plaintiff filed his motion for change of custody, which the court reasoned had taken "an increasingly high toll on the children, their health, and [was] contrary to their best interests." Because the trial court's opinion makes it clear that it considered whether the circumstances that existed *before* November 2017 warranted revisiting the custody order, there is no reason to believe that the trial court would have reached a different result if it had considered this issue before entry of the November 15, 2017 order that effectively granted plaintiff physical custody.

In arguing that the trial court's procedural error was not harmless, defendant contends that the suspension of her parenting time resulted in a "judicially engineered . . . new established custodial environment" and "invariably affected all of the future proceedings in this case." We disagree. "An established custodial environment exists 'if over an appreciable time the child naturally looks to the custodian in that environment for guidance, discipline, the necessities of life, and parental comfort.' " *Yachcik*, 319 Mich App at 47, quoting MCL 722.27(1)(c). "The age of the child, the physical environment, and the inclination of the custodian and the child as to permanency of the relationship shall also be considered." MCL 722.27(1)(c). The existence of an established custodial environment affects the burden of proof imposed on the party seeking a change in custody as it relates to the best interests of the child. *Griffin v Griffin*, 323 Mich App 110, 119-120; 916 NW2d 292 (2018). Although the trial court's opinion is somewhat contradictory in its discussion of the children's established custodial environment, the court applied the higher clear and convincing evidence burden of proof that applies when the established custodial environment will be altered by the court's order. See *id*. at 119. Because the trial court applied the highest burden of proof applicable to plaintiff's motion, any effect the court's procedural error had on the established custodial environment was harmless. See *Kubicki v Sharpe*, 306 Mich App 525, 541; 858 NW2d 57 (2014) (failure to articulate established custodial environment findings was harmless where trial court applied clear and convincing evidence standard).

Turning to defendant's contention that the court's procedural error tainted the later proceedings, defendant failed to expand upon this conclusory argument. "It is well established that [a] party may not merely announce a position and leave it to this Court to discover and rationalize the basis for the claim." *Eldred v Ziny*, 246 Mich App 142, 150; 631 NW2d 748 (2001) (quotation marks and citation omitted; alteration in original). As such, this Court need not address it. *Id*. Defendant's position lacks merit at any rate because the trial court followed the appropriate framework for modifying custody in its opinion, albeit well after it first granted plaintiff physical custody on a temporary basis. That is, after finding that it was appropriate to revisit the issue of custody, the court determined the applicable burden of proof on the basis of the children's established custodial environment, and proceeded to conduct an in-depth analysis of the statutory best-interest factors. See *Lieberman*, 319 Mich App at 79-84.

Furthermore, while the trial court's opinion references and relies upon a number of events that occurred after it temporarily granted plaintiff physical custody, it is evident that the best-interest factors the court found most important were Factors (a), (j), and (*l*), and the court's emphasis on those factors would still have been supported around the time plaintiff originally sought suspension of defendant's parenting time. Factor (a) considers "[t]he love, affection, and

other emotional ties existing between the parties involved and the child." MCL 722.23(a). In pertinent part, the trial court found that Factor (a) greatly favored plaintiff because, despite the love both parents felt for the children, defendant's actions "produced significant conflict and impacted the existing emotional ties between her and the children." Had the trial court held an evidentiary hearing before modifying the custody arrangement on a temporary basis, this finding would still have been supported by evidence of the events that occurred in the fall of 2017. By that time, the relationship between defendant and IDO had already deteriorated to the point that IDO was running away from defendant's home in fear of defendant's antics, clearly evincing a breakdown in the emotional ties IDO felt toward defendant. Although the discord between defendant and GDO was less severe, GDO's protective attitude toward his twin sister apparently caused him to resent defendant's treatment of IDO and to similarly reject voluntary contact with defendant. For instance, there was evidence that GDO locked himself in a friend's house with IDO on August 24, 2017, to avoid defendant and that he refused to leave the school with defendant on more than one occasion that fall. In comparison, while defendant clearly disagreed with many of plaintiff's parenting decisions, it appears undisputed that the children felt great love, affection, and emotional ties with plaintiff, further supporting the trial court's finding that Factor (a) favored plaintiff.

Factor (j) addresses "the willingness and ability of each of the parties to facilitate and encourage a close and continuing parent-child relationship between the child and the other parent . . . ." MCL 722.23(j). The trial court determined that this factor overwhelmingly favored plaintiff because defendant "actively wage[d] acrimonious campaigns designed to alienate the children both from her and from [plaintiff]," while believing that plaintiff was responsible for turning the children against her. The court also found that defendant was unwilling to facilitate a relationship between the children and plaintiff. Again, the trial court could have reached these same findings if it had considered the matter at or near the time it granted plaintiff physical custody. Focusing on the fall of 2017, there was evidence that defendant placed a calling restriction on the children's phones so that they were unable to directly call plaintiff and that plaintiff's phone number was placed on a "watch list" that alerted defendant when GDO was communicating with plaintiff. Because of these restrictions, IDO was forced to communicate with plaintiff through social media applications and it is unclear whether GDO, who was not using social media at the time, had any contact with plaintiff while in defendant's care. Defendant's interference with the children's ability to communicate with plaintiff, even in the face of a court order requiring that the children have access to their phones to communicate with the noncustodial parent, supports that trial court's finding that defendant was unwilling to facilitate plaintiff's relationships with the children. Furthermore, defendant's response to plaintiff's motion for change of custody was riddled with criticism and attempts to portray plaintiff as the source of the family's problems, and defendant's belief that plaintiff was at fault for the family discord continuously pervaded her testimony about the fall of 2017. In contrast, plaintiff testified that he consistently consulted the children about whether they wanted to begin repairing their relationships with defendant, reminding them that defendant loved and missed them, and the trial court found plaintiff's testimony highly credible. Thus, the trial court's finding that Factor (j) favored plaintiff would have been supported had the trial court addressed the matter earlier in compliance with the procedural requirements of the Child Custody Act.

Factor (*l*) permits the trial court to consider any other factor relevant to the dispute. MCL 722.23(*l*). Under this factor, the trial court relied on several concerning attributes of the case: (1) defendant's failure to appreciate the emotional damage her actions were inflicting upon the children; (2) defendant's decision to "publically humiliate" GDO by adding the phrase "ur mom" to his Xbox gaming account, which was visible to the public; (3) defendant's act of leaving an FOC meeting to drive to the children's school in an attempt to remove them from class in the middle of the day; (4) defendant's "somewhat concerning and bizarre" messages to plaintiff; (5) the fact that defendant's "intentionally antagonistic, spiteful, and emotionally damaging behavior" inflamed the familial conflict; (6) that plaintiff had to seek therapy to obtain tools to better handle defendant's behavior over the years; and (7) a variety of matters noted in the children's 2015 counseling records. Again, the majority of the additional considerations that the trial court addressed under Factor (*l*) were present to some degree at the time the court temporarily granted plaintiff physical custody. As noted by the trial court, a CPS investigator testified that she would have substantiated a complaint for emotional abuse in November 2017 had the children remained in defendant's care. Defendant went to the children's school to remove them from class after the second meeting with Doan in November 2017. With respect to defendant's concerning messages to plaintiff, the trial court cited messages admitted as defendant's Exhibit 19 and plaintiff's Exhibit P, which were exchanged in June 2017 and September 2017, respectively. Plaintiff's therapist testified that she had been working with plaintiff for more than 10 years to help him learn ways to effectively communicate with defendant. Finally, although the trial court quoted extensively from the children's 2018 counseling records, that fact alone does not undermine the strength of the trial court's other findings concerning matters that existed in the fall of 2017.

Defendant also takes issue with the trial court's reliance on a referee recommendation to resolve her January 2018 motion to restore her custodial rights. Defendant contends that the recommendation was the product of a meeting between the referee, Doan, and the parties' attorneys, which the parties were not allowed to attend. Defendant argues that the trial court blindly accepted the recommendation in open court without making any findings concerning proper cause, the children's established custodial environment, or the best-interest factors.

Defendant's argument mischaracterizes the record. On January 17, 2018, two motions were before the court for hearing: plaintiff's show cause motion concerning defendant's violations of the court's earlier orders and defendant's motion to restore her custodial rights. The parties sought several forms of relief in their respective motions. After the parties' attorneys met with a referee in private, the trial court opened the hearing by noting that there were three different recommendations from the referee. The first recommendation concerned the children's counseling, which defense counsel had no objection to. The second recommendation related to recalculating child support, with which defense counsel similarly expressed satisfaction. The third recommendation concerned the transfer of GDO's gaming account. The trial court overruled defendant's objections concerning the gaming account and affirmed an earlier order requiring defendant to transfer the account to GDO. No further recommendations were referenced by the trial court or the parties, and defendant has not presented any evidence to the contrary. Thus, while the trial court did resolve some of the ancillary matters involved in the motions by relying primarily on the referee's recommendation, those issues did not involve custody or parenting time and, thus, did not require findings regarding proper cause, the established custodial environment, or the best-interest factors.

Furthermore, at the same hearing, the trial court acknowledged that defendant's motion to restore her custodial rights presented a strong argument that should be addressed at an evidentiary hearing. To that end, the trial court scheduled a hearing to take place two days later, at which time custody and parenting time would be addressed. Although the evidentiary hearing was ultimately adjourned, the adjournment was entered at the request of the parties. Extensive testimony was later taken, and the trial court made detailed findings in support of its final order granting plaintiff sole legal and physical custody. Accordingly, defendant's argument is unsupported by the record.

## IV. ADMISSIBILITY OF EVIDENCE SUPPORTING THE TRIAL COURT'S RULINGS

Defendant next argues that the trial court erred by basing its decisions on ex parte communications and inadmissible evidence. Again, we agree, in part, but find the trial court's error harmless in the context of this case.

Defendant argues that the trial court erred by considering ex parte communications with Doan. Defendant's argument is fundamentally flawed because an ex parte communication is "[a] communication between counsel or a party and the court when opposing counsel or party is not present." *Black's Law Dictionary* (11th ed). Because Doan was neither a party nor counsel in this matter, the trial court's private communication with Doan does not constitute ex parte communication. Furthermore, this Court has held that the trial court may consider an FOC report "as an aid to understanding the issues to be resolved." *Harvey v Harvey*, 257 Mich App 278, 292; 668 NW2d 187 (2003). The trial court's August 14, 2018 order directing Doan to consult with the children's counselor, Kaca Popovic, for the purpose of submitting a recommendation for continued reunification efforts was not improper, as the Child Custody Act permits the court to "[u]tilize community resources in behavioral sciences and other professions in the investigation and study of custody disputes and consider their recommendations for the resolution of the disputes," MCL 722.27(1)(d), and "[t]ake any other action considered to be necessary in a particular child custody dispute," MCL 722.27(1)(e). As the children's treating counselor, Popovic undoubtedly had significant insight on the children's progress and should have been a neutral source of information.[1]

That being said, the portion of the trial court's order enjoining Popovic and Doan from "discussing or disclosing the contents of their communication to counsel or the parties," is more problematic. Section 7a of the Friend of the Court Act, MCL 552.501 *et seq*., provides that

> [a] copy of each report, recommendation, and any supporting documents or a summary of supporting documents prepared or used by the friend of the court or an employee of the office shall be made available to the attorney for each party and to each of the parties before the court takes any action on a recommendation by the office. [MCL 552.507a(1).]

---

[1] At the time the trial court signed the August 14, 2018 order directing Doan to consult with Popovic, it had no reason to believe that Popovic harbored bias against either party. However, Popovic later admitted that she was biased against defendant as a result of an explosive joint counseling session that took place later that month.

Similarly, MCR 3.210(C)(6) directs the trial court to give the parties an opportunity to review and file objections to a report submitted by the FOC before a decision is made. Given these mandates, the trial court committed clear legal error by precluding disclosure of the recommendation to the parties.

However, the trial court's error does not require appellate relief because it was harmless. *Fletcher*, 447 Mich at 889. Although the trial court's communication with Doan does not constitute ex parte communication, the dangers inherent in ex parte communications bear consideration. *Cheesman v Williams*, 311 Mich App 147, 162; 874 NW2d 385 (2015) stated:

> In *Grievance Administrator v* Lopatin, 462 Mich 235, 262-263; 612 NW2d 120 (2000), our Supreme Court discussed the danger of ex parte communications:
>
> "Ex parte communications deprive the absent party of the right to respond and be heard. They suggest bias or partiality on the part of the judge. Ex parte conversations or correspondence can be misleading; the information given to the judge 'may be incomplete or inaccurate, the problem can be incorrectly stated.' At the very least, participation in ex parte communications will expose the judge to one-sided argumentation, which carries the attendant risk of an erroneous ruling on the law or facts. At worst, ex parte communication is an invitation to improper influence if not outright corruption." [Quoting Shaman, Lubet & Alfini, Judicial Conduct and Ethics (3d ed), § 5.01, pp 159-160.]

These risks are not present in this case because the parties were not deprived the opportunity to respond and be heard. At a hearing on September 13, 2018, the trial court told the parties that Doan and Popovic recommended that the children needed "a break," with defendant "out of the picture" for a while, perhaps until the end of the school semester. Both parties had an opportunity to advise the court about their respective perceptions of the parties' recent attempts to restore parenting time and engage in joint counseling, and both parties had previously elicited testimony from Popovic about her counseling techniques. Lastly, defense counsel opposed the recommendation at the hearing, arguing that the continued separation of the children from defendant was making the situation worse. Thus, the trial court did not make the decision to resume the evidentiary hearing in lieu of ordering a specific counseling and parenting-time schedule based solely on one-sided communication.

Defendant also challenges the trial court's reliance on certain evidence in its final opinion and order, namely, text messages that were not properly before the court and the court's *in camera* interview with the children. The text messages that defendant challenges were included in a motion filed by plaintiff after the evidentiary hearings concluded. It is notable that while the motion was never heard by the trial court, defendant filed a response to the motion in which she admitted sending the messages, disputing only the negative implications plaintiff attached to the messages. Assuming, without deciding, that the trial court's reference to these messages in its opinion was improper under these circumstances, we disagree with defendant's assertion that the trial court "extensively relied" on the messages to reach its decision regarding custody and parenting time.

The trial court conducted an in-depth analysis of the best-interest factors, citing specific evidence and findings as to each factor, including Factor (*l*), which serves as a catch-all provision permitting consideration of any factor the court deems relevant. It was only after the court concluded its analysis of the best-interest factors that it noted, almost as an aside, the messages submitted with plaintiff's motion after the evidentiary hearings. Thus, it does not appear that the trial court considered the messages in the context of its best-interest analysis, which is what ultimately controls all important decisions regarding the children involved in a custody dispute. See MCL 722.25(1) (stating that the best interests of the child control in custody disputes); *Pierron v Pierron*, 486 Mich 81, 85; 782 NW2d 480 (2010) ("[W]hen the parents cannot agree on an important decision . . . the court is responsible for resolving the issue in the best interests of the child."). Moreover, the court cited the messages as evidence that defendant took no responsibility for her actions, believed that plaintiff was at fault for the situation, and failed to acknowledge or internalize the basis for IDO's adverse feelings toward her. Even if the court had not referred to the messages in its opinion, it could have reached the same conclusion from other evidence presented at the evidentiary hearings and cited throughout its opinion.

Turning to defendant's challenge regarding the trial court's *in camera* interview of the children, defendant contends that the trial court improperly used the *in camera* interview for fact-finding. We disagree. Under MCL 722.23(i), the reasonable preference of a child involved in a custody dispute is a factor that must be considered in the court's best-interest analysis if the court determines that the child is of sufficient age to express a preference. *Kubicki*, 306 Mich App at 544-545. The trial court can discern the child's preference during an *in camera* interview, as long as the interview is limited "to a reasonable inquiry of the child's parental preference." *Molloy v Molloy*, 247 Mich App 348, 351; 637 NW2d 803 (2001), vacated in part on other grounds 466 Mich 852 (2002). See also MCR 3.210(C)(5) (permitting private interview with child focused on child's reasonable preference). While the interview cannot be used for fact-finding, it also "should not take place in a vacuum[.]" *Thompson v Thompson*, 261 Mich App 353, 365; 683 NW2d 250 (2004), quoting *Molloy*, 247 Mich App at 353 (quotation marks omitted). Indeed, the trial court should make inquiries "to test the authenticity, the motives, and the consistency of the preference." *Molloy*, 247 Mich App at 353. The trial court "must state on the record whether children were able to express a reasonable preference and whether their preferences were considered by the court, but need not violate their confidence by disclosing their choices." *Fletcher v Fletcher*, 200 Mich App 505, 518; 504 NW2d 684 (1993), rev'd in part on other grounds 447 Mich 871 (1994).

Apart from noting that an *in camera* interview occurred, during which the children appeared "grounded," the trial court's only discussion of the interview was in the context of analyzing Factor (i). With respect to that factor, the court stated only that it interviewed the children, "found their statements credible and compelling," and "considered their preference and statements in its deliberations." Thus, even if the court heard extraneous information in the course of testing the reasonableness of the children's preferences, there is simply no indication that it asked the children questions outside the permissible scope of the interview or considered extraneous information in evaluating the other best-interest factors. See *Thompson*, 261 Mich App at 365-366.

## V. DISCOVERY

Next, defendant argues that the trial court erred by denying her requests to compel production of plaintiff's social media posts, the user names and passwords for the children's social media accounts, and the raw test data from the psychological evaluations of the parties and children. We agree, in part, but again find that the trial court's error was harmless.

"It is well settled that Michigan follows an open, broad discovery policy that permits liberal discovery of any matter, not privileged, that is relevant to the subject matter involved in the pending case." *Augustine*, 292 Mich App at 419. "However, a trial court should also protect the interests of the party opposing discovery so as not to subject that party to excessive, abusive, or irrelevant discovery requests." *Cabrera v Ekema*, 265 Mich App 402, 407; 695 NW2d 78 (2005). Defendant alleged that she should be allowed access to the children's social media accounts because the children's state of mind, as well as their social media use, was central to the parties' dispute. Although the trial court did not articulate its reason for denying defendant's request, we cannot conclude that the trial court's ruling amounted to an abuse of discretion because there was evidence that defendant had abused similar access in the recent past. Defendant had access to GDO's Xbox gaming account for several months because it was associated with her personal Microsoft account. Before giving GDO the information needed to access the account at plaintiff's house, defendant added the phrase "ur mom" to GDO's publically accessible profile information. The trial court characterized defendant's action as "highly concerning" in that defendant chose to "publically humiliate" GDO. Given this finding, it is not difficult to infer the trial court denied defendant's request for access to the children's social media accounts to prevent defendant from abusing the access. Despite Michigan's broad discovery policy, the trial court did not err by denying a request that could be used for abusive purposes, particularly when the parties presented ample evidence from which the children's state of mind could be discerned, including, most notably, the children's counseling records. *Id.*

Furthermore, defendant's contention that the children's accounts were relevant because "the children's access and use of social media was a prime issue of contention between the parties," is misplaced. Although defendant's discipline related to social media may have been a catalyst for the breakdown of defendant's relationship with IDO, the issue before the court was whether modification of the parties' custody arrangement was in the children's best interests. Regardless of whether defendant's disciplinary measures were appropriate or whether the children's feelings about defendant were objectively reasonable, the evidence demonstrated that the children had an honest and deep-set fear of defendant such that continuing the previous custody arrangement was no longer in their best interests.

With respect to defendant's request for copies of plaintiff's social media posts, defendant alleged that the posts might demonstrate that plaintiff had been alienating the children against defendant. On appeal, defendant contends the materials were relevant to plaintiff's state of mind about defendant, the children, and the custody dispute. Despite the limited relevance asserted by defendant, defendant sought *all* of plaintiff's social media posts for "the last year," without attempting to narrow the scope of the request to posts that related to defendant, the children, or the custody dispute. As such, the trial court could have reasonably determined that defendant's request improperly sought excessive discovery. *Id.* More importantly, the trial court reviewed plaintiff's posts *in camera* and determined that none of the materials were relevant to the custody dispute.

Thus, even if the trial court had permitted discovery of plaintiff's social media posts, it is improbable that the court would have permitted admission of the posts at the evidentiary hearing.

Defendant also alleges that the trial court erred by denying her request to compel production of the raw data upon which FOC psychologist Linda Green relied to reach the opinions outlined in her psychological report. Defendant filed an emergency motion to compel the raw data, alleging that it was discoverable under MCR 3.218(B) and the trial court's order referring the family for psychological assessment, which designated information relied on by the expert as nonconfidential. The trial court denied defendant's motion without explanation.

Under MCR 3.218(B)(1), the FOC must give parties and attorneys of record access to nonconfidential records. MCR 3.218(A)(1) defines "records" as "any case-specific information the [FOC] office maintains in any media[.]" As a psychologist employed by the FOC, Dr. Green would be subject to the requirements of MCR 3.218. Given the plain language of these rules, we agree that the trial court erred by denying defendant's motion to compel production of the raw test data, as the data was "case-specific" and requested by defendant's attorney of record.

Defendant also argues that the trial court exacerbated this error by barring defense counsel from eliciting testimony about the raw data when Dr. Green testified at the evidentiary hearing. Defense counsel asked Dr. Green about defendant's specific results on four individual scales from the Minnesota Multiphasic Personality Inventory II (MMPI-II) test.[2] Dr. Green indicated that she did not have the raw data available during her testimony, but that all of defendant's clinical scales were within normal limits, which meant that defendant's results reflected trends, rather than clinical syndromes. Dr. Green also relied on "other validating information," such as defendant's history, documentation, and input from other professionals, to characterize the trends reflected in the test results. When Dr. Green refused to read aloud the "complete computer printout . . . about [defendant's] personality profile," the trial court rejected defense counsel's objection, reasoning that Dr. Green was the expert on how to interpret the data. The court concluded that counsel could "ask [Dr. Green] what she used, but I'm not going to get into the raw data." With respect to plaintiff's test results, Dr. Green agreed that some of plaintiff's validity scales were elevated, but not to a point that would render plaintiff's profile invalid.

Because Dr. Green testified as an expert in psychology, the admissibility of her testimony was governed by MRE 702, which provides:

> If the court determines that scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

---

[2] According to Dr. Green's report, the MMPI-II is a "self-administered standardized psychometric test of adult personality and psychopathology."

By limiting defense counsel's inquiry into the data upon which Dr. Green relied, the trial court improperly limited defendant's ability to test the reliability of Dr. Green's expert opinion.

Although the trial court abused its discretion in this regard, this Court must affirm the trial court's order granting plaintiff physical and legal custody unless the trial court "made findings of fact against the great weight of evidence or committed a palpable abuse of discretion or a clear legal error on a major issue." MCL 722.28. Even when such an error occurred, appellate relief should not be granted if the error was harmless. *Fletcher*, 447 Mich at 889. The trial court's error was ultimately harmless because the trial court did not place particular emphasis on Dr. Green's report or opinion. The parties' psychological profiles were most relevant to best-interest Factor (g) (mental and physical health of the parties), MCL 722.23(g), and the trial court did not find Dr. Green's reiteration of defendant's self-reported mental health history dispositive, nor did the court refer to either party's psychological profiles in its analysis. The only other time the trial court cited Dr. Green's report or opinion was in the context of Factor (b) (capacity and disposition to provide love, affection, and guidance and to continue education and raising of child in his or her religion or creed, if any), MCL 722.23(b). With respect to that factor, the trial court noted Dr. Green's opinion that defendant's capacity to give love, affection, and guidance was hindered by her "unpredictable and intimidating reactions," which resulted in "fragile attachments, withdrawal, mistrust, and anxiety." Outside of Dr. Green's opinion, the record was replete with examples of defendant's extreme reactions to conflicts with plaintiff and the children. Furthermore, the children's diminished relationships with and feelings toward defendant were at the heart of the custody dispute. Given the ample evidence regarding these matters, the trial court's repeated comments about the way defendant's behavior affected the children, and the court's minimal citation of Dr. Green's opinion, it is nearly certain that the trial court would have made a similar finding under Factor (b) even if defendant had received the raw test data in discovery and been permitted to question Dr. Green more closely regarding the same.

Reviewing the entirety of the trial court's opinion, it is clear the court was most concerned with the implications of each party's behavior during the proceedings and the manner in which that behavior affected the children, rather than the details of the parties' psychological profiles. Thus, even if the trial court had ordered Dr. Green to supply the raw data from the psychological testing and permitted defense counsel to question Dr. Green about the same, it is improbable that the result of the proceedings would have been different because the tendencies implicated by the parties' psychological profiles did not alter their actual conduct throughout the case or the fact that defendant's actions were having a significant negative effect on the children's mental and emotional well-being. As such, the trial court's error in this regard does not warrant relief.

## VI. BIAS IN ENTERING AND ENFORCING ORDERS

Defendant next contends that the trial court exhibited bias toward her by striking provisions in stipulated orders that provided parenting time for defendant, refusing to enforce a stipulated order for parenting time, and refusing to appoint a new counselor after Popovic admitted that she was biased against defendant. We disagree.

Defendant's position ignores the fact that the Child Custody Act imposes an affirmative obligation on the trial court to "ensure that the resolution of any custody dispute is in the best interests of the child." *Harvey v Harvey*, 470 Mich 186, 192; 680 NW2d 835 (2004). While

-13-

defendant cites caselaw supporting the general notion that courts must enforce unambiguous agreements as written, defendant's authority is unpersuasive in the context of custody disputes because "the deference due parties' negotiated agreements does not diminish the court's obligation to examine the best interest factors and make the child's best interests paramount." *Id*. at 193. Each of the decisions defendant complains of was clearly undertaken in recognition of this rule of law.

Although the parties stipulated in January 2018 that defendant could contact the children by phone and text message, the trial court struck that provision before signing the order. At that time, the children had not communicated with defendant for several months, and defendant had yet to engage in any sort of reunification counseling with the children. The trial court's order did not preclude defendant from reconnecting with her children, it merely required that the first contact between them occur in a therapeutic setting. The trial court's later decision to modify an order requiring the children to respond to defendant's phone calls and text messages was similarly guided by the best interests of the children. The subject order used mandatory language to describe the children's obligation to respond, and the trial court modified the order to "encourage," rather than require, the children's cooperation, doing so only after the parties filed motions that made the children's negative responses to the forced contact evident. A month later, the trial court clearly articulated that it declined to enforce a stipulated order regarding parenting time because it was not convinced that the children were ready to have more contact with defendant after recent attempts to force the matter had been disastrous. Finally, despite Popovic's admission of bias toward defendant in October 2018, the trial court declined to appoint a new counselor because the children had developed a good rapport with Popovic and were in need of stability and "respite from the significant strain and emotional turmoil" caused by the custody dispute. Given the trial court's focus on the well-being and best interests of the children, we cannot conclude that the court's rulings were "so palpably and grossly violative of fact and logic that [they] evidence[] a perversity of will, a defiance of judgment, or the exercise of passion or bias." *Yachcik*, 319 Mich App at 31 (quotation marks and citation omitted).

## VII. CHILD CUSTODY RULING

Next, defendant challenges the trial court's decision to grant plaintiff sole legal and physical custody, arguing that the ruling was an abuse of discretion and against the great weight of the evidence. We disagree.

Defendant first argues that the trial court abused its discretion by making an unfounded credibility determination to insulate its decision from review. We disagree. It is well-accepted that appellate courts generally defer to a trial court's determinations regarding credibility, *Elahham v Al-Jabban*, 319 Mich App 112, 126; 899 NW2d 768 (2017), as the court that hears the testimony and observes the witnesses is in a superior position to make that determination, *Fletcher*, 447 Mich at 890. However, because factors apart from demeanor and inflection affect credibility, a trial court's credibility determination is not completely shielded from review. *Beason v Beason*, 435 Mich 791, 804; 460 NW2d 207 (1990). This Court may scrutinize and reject a credibility determination when a witness's testimony is contradicted by objective evidence or when the testimony is "so internally inconsistent or implausible on its face that a reasonable factfinder would not credit it." *Id*. (quotation marks and citation omitted).

The trial court found defendant's testimony "wholly not credible, largely disingenuous, and fantastical at best," noting that it had to repeatedly admonish defendant to answer questions directly instead of providing unprompted narratives and that defendant's testimony was "wildly misleading and nonsensical" at times. The trial court also indicated that defendant provided combative and evasive responses and that her demeanor over the lengthy series of hearings "vacillated between laughing, crying, tense, and calm seemingly independent of anything occurring in the courtroom, the question posed to her, or anything about the particular incident about which she testified." While we are unable to evaluate defendant's demeanor at the hearings, the remainder of the trial court's criticisms are well supported by the record.

For instance, when asked whether she added plaintiff's phone number to a watch list to monitor plaintiff's communications with GDO, defendant said, "I have a right to see what my son's doing, so I don't really know." Defendant also stated that she did not create a watch list and did not know what it was. Plaintiff's counsel confronted defendant with a message from GDO's phone indicating that plaintiff's phone number had been added to the watch list, which read, "Your parent will be notified when you call or text this person." In response, defendant said she did not know how GDO "got that" because he should not have access to the parental controls for defendant's Verizon account. Defendant also reasoned: "I think I have a right to do that as a parent. So fine with me." Later, when pressed about whether she knew that GDO would see that she changed his Xbox account profile to include the phrase "ur mom," defendant began a denial before shifting her answer midsentence to say, "Yeah, you know what and I am his mom so there." Plaintiff's counsel also asked defendant whether she went to the children's school with her former lawyer on the second day of class, and defendant began saying, "You know that we did because we were supposed to have—" at which point the trial court asked defendant to answer yes or no. Defendant admitted going to the school, but denied asking to take the children out of school early because it was her lawyer who made the request. When asked about her plans to relocate after selling her home, as required by her judgment of divorce, defendant said, "I just want to have my children back in my arms." Each of these examples of nonresponsive or misleading testimony occurred on the first day of the hearing alone, and the trial court had to instruct defendant to answer questions directly at least eight times that day. Given the nature of defendant's testimony that day and throughout the remainder of the proceedings, the trial court's poor view of defendant's credibility appears well grounded.

Defendant contends that the trial court's perception went against the great weight of the evidence because her testimony was corroborated by text messages and over 40 exhibits that the trial court failed to consider. We disagree. While many of the text messages do corroborate assertions defendant made at the hearings, the matters to which they relate were essentially uncontested, such as defendant's insistence that IDO stop using social media; an inappropriate message IDO received from an anonymous person asking for nude photographs; plaintiff telling defendant that the children were only comfortable with receiving text message communications from her on their birthday; and the numerous text messages defendant sent the children without receiving a response. Other exhibits, like defendant's letter to Doan after their second meeting and defendant's e-mail to plaintiff on February 2, 2018, merely reiterated defendant's perception of events and were contradicted by other evidence. The few exhibits that were particularly favorable to defendant's credibility, such as a June 2017 text message in which plaintiff agreed to a family meeting to discuss name calling and other respect issues with the children, were not so

persuasive that they would adequately rehabilitate defendant's credibility and render the trial court's determination contrary to the great weight of the evidence.

Defendant also argues that the trial court erred by focusing on its negative view of defendant, without considering any of plaintiff's actions, expert testimony that both parties were at fault, and testimony from several witnesses indicating that defendant was polite, appropriate, and did not yell. Defendant is correct that nearly every witness testified that she was appropriate, polite, and respectful during their interactions. Defendant's behavior toward third parties, however, is not necessarily indicative of her behavior toward plaintiff and the children. Indeed, according to Dr. Green, defendant has "difficulty modulating her response to conflict *particularly when it involves her family and her children* and at those times has been known to have exaggerated responding." (Emphasis added.) Defendant's other arguments are simply unsupported by the record. Contrary to defendant's assertion that the children's guidance counselor and Dr. Green indicated that both parties were culpable for the custody dispute in this case, both witnesses actually testified in general terms, agreeing that both parents typically have some level of responsibility for familial conflict. Furthermore, while there was evidence suggesting that the children *might* be negatively impacted if they heard plaintiff express his fear of defendant, the evidence that plaintiff did so on a regular basis was far from "uncontroverted." Defendant presented a single recording of the parties' October 11, 2017 encounter with the police in which plaintiff, in IDO's presence, said he feared defendant. This single instance does not bear significant weight in comparison to the balance of the evidence presented to the court. Furthermore, while defendant may disagree with the trial court's findings, the trial court found from the totality of the evidence that plaintiff's actions were generally appropriate and in the best interests of the children.

Lastly, defendant argues that the trial court's findings were flawed because the court did not address the best interests of the children individually. This Court has previously explained that "in most cases it will be in the best interests of each child to keep brothers and sisters together." *Foskett v Foskett*, 247 Mich App 1, 11; 634 NW2d 363 (2001), quoting *Wiechmann v Wiechmann*, 212 Mich App 436, 440; 538 NW2d 57 (1995) (quotation marks omitted). "However, if keeping the children together is contrary to the best interests of an individual child, the best interests of that child will control." *Wiechmann*, 212 Mich App at 440. Defendant argues that the trial court erred by failing to take into account that she had no conflicts with GDO. We disagree.

Even though GDO was not directly involved in the underlying conflicts that caused this matter to come before the trial court, the evidence demonstrated that the twin children shared an extremely close sibling bond and that GDO felt particularly protective of his sister. Thus, while there was no indication that GDO initially had the same volatile relationship with defendant that IDO did, GDO still began to distance himself from defendant, going so far as to lock himself inside a friend's home with IDO to avoid defendant. GDO was also presenting as emotional and "burnt out" at school. Furthermore, the police officer who spoke with GDO on October 11, 2017, testified that GDO was timid, chose his words very carefully, and seemed scared to say what he wanted to. GDO remained with defendant that night while IDO stayed with plaintiff and, the very next day, GDO went to plaintiff's home and refused to return to defendant. According to the psychologist who briefly treated the children in the fall of 2017, GDO was shut down and "afraid to take a stand" because he feared that the same things that happened to IDO would happen to him. The animosity GDO felt toward defendant continued to grow in the following months, particularly in

the aftermath of defendant's interference with his gaming account. By June 2018, GDO was expressing extreme hatred toward defendant in his counseling sessions with Popovic. In light of these facts, the trial court did not err because keeping the children together was consistent with GDO's best interests. Moreover, given the strength of the children's bond, it is quite probable that separating the children would have created yet another hurdle in the path to the children repairing their relationships with defendant. See *id*. at 439-440 ("The sibling bond and the potentially detrimental effects of physically severing that bond should be seriously considered in custody cases where the children likely have already experienced serious disruption in their lives as well as a sense of deep personal loss.").

## VIII. PARENTING-TIME RULING

Next, defendant challenges the trial court's final order, in which she was granted no parenting time. Defendant argues that the ruling was contrary to the statutory presumption that parenting time should be granted in a manner that will foster a strong parent-child relationship and that the lengthy suspension of her parenting time constitutes a de facto termination of her parental rights. We disagree.

MCL 722.27a(1) creates a statutory presumption that it is in a child's best interests to have a strong relationship with both of his or her parents. *McRoberts v Ferguson*, 322 Mich App 125, 140; 910 NW2d 721 (2017). To that end, parenting time should be granted "in a frequency, duration, and type reasonably calculated to promote a strong relationship between the child and the parent granted parenting time." MCL 722.27a(1). But while a child has a presumed right to parenting time, parenting time should not be ordered if "the court determines on the record by clear and convincing evidence that parenting time would endanger the child's physical, mental, or emotional health." *Lieberman*, 319 Mich App at 80, citing MCL 722.27a(3).

This Court recently addressed an identical argument in *Luna v Regnier*, 326 Mich App 173, 183; 930 NW2d 410 (2018). In that case, the father moved to suspend the mother's parenting time, alleging that the children did not want to see the mother and would act out in frustration whenever she was mentioned. *Id*. at 177. The children's guardian ad litem testified that the children struggled with the court-ordered parenting time and would run into the woods to avoid the mother. *Id*. at 178. The children's negative behaviors toward the mother continued to increase, and the children's counselor believed it would be "beneficial to suspend parenting time because the stress and anxiety it caused the children negatively affected their progress on other mental, social, and educational issues." *Id*.

This Court affirmed the trial court's suspension of the mother's parenting time under MCL 722.27a(3). *Id*. at 180-183. This Court agreed that forcing parenting time under the circumstances "was likely to cause emotional trauma and to drive a wedge further between mother and child, not foster a strong relationship." *Id*. at 180-181. The mother maintained that the children's negative feelings could not be attributed to her when her contact with them had been limited. *Id*. at 181. This Court agreed with the trial court's conclusion that forced parenting time would cause emotional or mental harm to the children, even if the children's perceptions regarding the mother were unfounded. *Id*. This Court also rejected the mother's argument that the father had disparaged her in front of the children, noting evidence to the contrary and deferring to the trial court's assessment of the witnesses' credibility. *Id*. at 182. Finally, this Court disagreed that the

-17-

suspension of the mother's parenting time without reunification therapy was akin to a de facto termination of her parental rights, but remanded the matter to the trial court to conduct periodic hearings to determine whether resuming parenting time would be in the children's best interests at a later time. *Id*. at 183.

The facts involved in the instant case are remarkably similar. Much like in *Luna*, the children remained extremely unwilling to engage with defendant throughout the proceedings, consistently expressing fear and anger toward her. Defendant raises similar objections to the trial court's ruling, arguing that her continued separation from the children is making matters worse and that the dysfunction in their parent-child relationships has been influenced and exacerbated by plaintiff. This Court's rationale in *Luna* is equally applicable here. Dr. Green opined that the children's reunification with defendant should be a gradual process "interdependent upon successful completion of goals, stability of mood, and readiness of the children." She further cautioned that the treatment would not necessarily involve a linear approach and may "ebb and flow with the children's tolerance of anxiety and feelings of safety." At the last evidentiary hearing, Popovic testified that the children continued to harbor feelings of fear and frustration and were not ready to resume their relationships with defendant. The court also interviewed the children about their custodial preferences and could have reasonably determined that the children's adamant opposition to any contact with defendant remained unchanged. Furthermore, the court and parties attempted to force the children to communicate with defendant on more than one occasion throughout the proceedings, and each attempt left the children emotionally distraught. Regardless of whether the children's feelings toward defendant were objectively reasonable, the evidence demonstrated that their feelings appeared genuine and were so strong that parenting time with defendant would endanger their mental or emotional well-being.

Also like in *Luna*, while there was some evidence that plaintiff's behavior could have affected the children, plaintiff denied speaking poorly of defendant, repeatedly testified that he was open to the children repairing their relationships with defendant, and spoke with the children often about whether they were ready and willing to resume contact with defendant. Given the substantial similarities between this case and *Luna*, we likewise conclude that the trial court did not abuse its discretion by suspending defendant's parenting time under MCL 722.27a(3). *Id*. at 180-183.

Defendant's characterization of the trial court's suspension of her parenting time as a de facto termination is also unpersuasive. Defendant exaggerates the record by claiming that she has been deprived all contact with the children since November 2017. Although her contact has been severely limited, defendant's assertion is clearly untrue because she engaged in a handful of joint counseling sessions with the children and exercised parenting time on at least one occasion. These contacts were ultimately counterproductive, but they occurred. Furthermore, while termination of parental rights results in a permanent severing of the legal ties between a parent and child, the trial court's suspension of defendant's parenting time is modifiable, and the trial court explicitly incorporated into its final order the periodic review mechanism described by the *Luna* Court to ensure that defendant's parenting time is restored if and when doing so would serve the best interests of the children. Accordingly, the trial court has not terminated defendant's parental rights.

## IX. REASSIGNMENT ON REMAND

Defendant's last argument on appeal is that this Court should order reassignment of this matter to a different judge on remand. Because we have found no error requiring a remand, we need not address defendant's request. *Cassidy v Cassidy*, 318 Mich App 463, 510; 899 NW2d 65 (2017). At any rate, we do not believe reassignment is necessary in this case. Repeated adverse rulings, no matter how erroneous, are generally not grounds for disqualification. *Bayati v Bayati*, 264 Mich App 595, 602-603; 691 NW2d 812 (2004). Although we can infer from the tone of the trial court's opinion that it developed a strong view of defendant's culpability in this case, the court's perception does not appear unreasonable. Furthermore, given the length and complexity of the lower court proceedings, reassignment would necessarily involve extensive waste of judicial resources without a clear indication that such waste is required. See *id*. Accordingly, we decline defendant's request to order reassignment of this matter.

Affirmed.

/s/ Christopher M. Murray
/s/ David H. Sawyer